UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

vs.                                        2:09-cr-75-FtM-29SPC

JASON BERGIN
CAREY BERGIN
ROBERT POWNER

_____

**OPINION AND ORDER**

Shortly after midnight on July 28, 2009, Lee County Sheriff's Office deputies went to 20494 Sherrill Lane, Estero, Florida to arrest Jason Bergin on two outstanding arrest warrants. A chain of events led officers to secure the residence until 2 p.m., when a search warrant was executed. Defendants argue that during this time there were at least seven violations of their Fourth Amendment rights. As a result, defendants argue, almost everything observed by the officers and everything seized (except the person of Jason Bergin) must be suppressed. Defendants also assert that the Fourth Amendment violations taint the subsequent federal indictment and arrest warrants, thus requiring suppression of post-arrest statements made almost two months later, as well as a number of potential government witnesses.

**I.**

On March 26, 2010, United States Magistrate Judge Sheri Polster Chappell submitted a Report and Recommendation (Doc. #205) to the Court recommending that various motions to suppress be

denied.   All three defendants filed objections (Docs. #218, 220, 221).   The Court heard oral arguments on July 21, 2010.

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify the magistrate judge's report and recommendation.   28 U.S.C. § 636(b)(1);   Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1)(C); see also United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009).   This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." Jeffrey S. v. State Bd. of Educ., 896 F.2d 507, 512 (11th Cir. 1990)(quoting H.R. 1609, 94th Cong., § 2 (1976)).   The district judge reviews legal conclusions *de novo*, even in the absence of an objection.   Cooper-Houston v. S. Ry. Co., 37 F.3d 603, 604 (11th Cir. 1994).

All three defendants seek to adopt each other's objections to the Report and Recommendation.   There being no objection to this procedure from the government, the Court will allow the adoption of the objections by all three defendants.

The Court accepts and adopts the procedural history (Doc. #205, pp. 1-3) and the summary of the testimony and evidence (Doc.

#205, pp. 3-18) set forth in the Report and Recommendation. Additionally, the magistrate judge determined that defendant Robert Powner had standing to join in the motions to suppress (Doc. #205, pp. 18-20), and no objection has been filed by the government to that determination. After a *de novo* review, that conclusion is accepted and adopted by the Court.

Because the testimony was inconsistent, the magistrate judge was required to make credibility findings and did so expressly. (Doc. #205, pp. 21-24). All three defendants object to the credibility determinations made by the magistrate judge.

In evaluating the factual version of events between the law enforcement officers and defendants and other witnesses, the Court defers to the magistrate judge's determinations unless her understanding of the facts appears to be unbelievable. United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). After reading the transcript of the evidentiary hearing and the memoranda of the parties, and hearing the oral argument of counsel, the Court finds that the credibility determinations of the magistrate judge are reasonable and justified. The magistrate judge did not base her credibility determination solely on the status of the witnesses, but rather weighed the testimony of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. The Court therefore accepts and

adopts the magistrate judge's credibility findings and the findings of fact flowing therefrom, and overrules defendants' objections based upon credibility determinations.

## II.

Defendants object to the magistrate judge's findings and conclusions regarding various entries by the officers into the residence/trailer at 20494 Sherrill Lane (hereinafter interchangeably referred to as the trailer or the residence). The specific Fourth Amendment issues will be addressed below, in chronological order. The Court adopts portions of the Report and Recommendation, supplements portions, and rejects portions.

## A.  General Legal Principles

The Fourth Amendment to the United States Constitution provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . ." U.S. Const. amend IV. The ultimate touchstone of the Fourth Amendment is reasonableness. Michigan v. Fisher, 130 S. Ct. 546, 548 (2009). While a search or seizure inside a home without a warrant is presumptively unreasonable, that presumption can be overcome. Id.

Beginning with Weeks v. United States, 232 U.S. 383 (1914), the Supreme Court created an evidentiary exclusionary rule to effectuate Fourth Amendment rights. Weeks barred physical evidence directly obtained through an illegal search from being used against

the victim of the search in a federal criminal prosecution.   In Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920) the Supreme Court held that the exclusionary rule applied to knowledge obtained by violation of the Fourth Amendment, as well as tangible materials obtained by the violation.   Also included within the scope of the exclusionary rule are overheard verbal statements and testimony about matters observed during the Fourth Amendment violation.   Wong Sun v. United States, 371 U.S. 471, 485 (1963). Thus, "[e]vidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."   Segura v. United States, 468 U.S. 796, 804 (1984).

In Silverthorne the Supreme Court extended the exclusionary rule to include indirect products, as well as the direct products, of a Fourth Amendment violation.   Wong Sun, 371 U.S. at 484-85. Siverthorne precluded the government from using not only the illegally obtained evidence itself, but also barred the use of information obtained during the unlawful search to craft a subpoena to obtain the illegally viewed documents from the victims of the Fourth Amendment violation.   Wong Sun precluded not only the use of verbal statements by a defendant after a warrantless arrest in his residence, but narcotics seized from another person who was discovered by exploiting defendant's statements.   Wong Sung stated the now-familiar standard:

> We need not hold that all evidence is "fruit of the
> poisonous tree" simply because it would not have come to

> light but for the illegal actions of the police.  Rather,
> the more apt question in such a case is "whether,
> granting establishment of the primary illegality, the
> evidence to which instant objection is made has been come
> at by exploitation of that illegality or instead by means
> sufficiently distinguishable to be purged of the primary
> taint."

Wong Sun, 371 U.S. at 487-88.  "The question to be resolved when it

is claimed that evidence subsequently obtained is 'tainted' or is

'fruit' of a prior illegality is whether the challenged evidence

was come at by exploitation of [the initial] illegality or instead

by means sufficiently distinguishable to be purged of the primary

taint."  Segura, 468 U.S. at 804-05 (internal quotation marks and

citation omitted).

Thus, it is now well-established that under the exclusionary

rule "evidence obtained in violation of the Fourth Amendment cannot

be used in a criminal proceeding against the victim of the illegal

search and seizure."  United States v. Calandra, 414 U.S. 338, 347

(1974)(citations omitted).  The "exclusionary rule reaches not only

primary evidence obtained as a direct result of an illegal search

or seizure, but also evidence later discovered and found to be

derivative of an illegality or 'fruit of the poisonous tree.'"

Segura, 468 U.S. at 804.  The "fruits" of a Fourth Amendment

violation include physical material actually seized in an illegal

search, items observed or words overheard in the course of the

unlawful activity, and confessions or statements of the accused

obtained during an illegal arrest and detention.  United States v.
Crews, 445 U.S. 463, 470 (1980)(citations omitted).

The purpose of the exclusionary rule is not to redress the
injury to the privacy of the Fourth Amendment victim, but to deter
future unlawful police conduct, thereby effectuating the Fourth
Amendment guarantee against unreasonable search and seizure.
Calandra, 414 U.S. at 347-48.  While it has not always been clear,
it is now settled that the question of whether the exclusionary
rule is appropriate in a particular context is a separate issue
from the question of whether the Fourth Amendment has been violated
by the police conduct.  Arizona v. Evans, 514 U.S. 1, 12-13 (1995);
Hudson v. Michigan, 547 U.S. 586, 592 (2006).  Thus, the fact that
a Fourth Amendment violation has occurred does not necessarily mean
that the exclusionary rule applies.  Herring v. United States, 129
S. Ct. 695, 700 (2009), citing Illinois v. Gates, 462 U.S. 213, 223
(1983).  Because the use of evidence obtained in violation of the
Fourth Amendment does not itself violate the Constitution, Pa. Bd.
of Prob. and Parole v. Scott, 524 U.S. 357, 361 (1998)(citations
omitted), application of the exclusionary rule "has been restricted
to those instances where its remedial objectives are thought most
efficaciously served."  Evans, 514 U.S. at 11.  "Moreover, because
the rule is prudential rather than constitutionally mandated, we
have held it to be applicable only where its deterrence benefits
outweigh its 'substantial social costs.'"  Scott, 524 U.S. at 363

(citing <u>United States v. Leon</u>, 468 U.S. 897 (1984)); <u>See also</u> <u>Hudson</u>, 547 U.S. at 594-99.

In light of this, certain exceptions to the exclusionary rule in the context of a criminal prosecution have been recognized. Thus, evidence which is derived from a Fourth Amendment violation will not be excluded, and may be presented in the government's case in chief, if it has an independent source, <u>Silverthorne</u> 251 U.S. at 392; <u>Segura</u>, 468 U.S. at 8056, if its discovery would have been inevitable by lawful means, <u>Nix v. Williams</u>, 467 U.S. 431, 444-48 (1984), if the connection between the unlawful conduct and discovery of the evidence is sufficiently attenuated, <u>Nardone v. United States</u>, 308 U.S. 338, 341 (1939); <u>Hudson</u>, 547 U.S. at 592-94, or if it was obtained in good faith within the meaning of <u>United States v. Leon</u>, 468 U.S. 897 (1984).   A more limited exception allows the prosecution to utilize illegally obtained evidence to impeach a testifying defendant, but not a defense witness.   <u>James v. Illinois</u>, 493 U.S. 307 (1990).

**B.   Independent Source for All Events of July 28, 2009**

The Report and Recommendation first discussed the government's assertion that it had an independent source for all of the items observed or seized on July 28, 2009.   The magistrate judge found that the on-going investigation by Task Force Agent Amber Baginski would not have inevitably led to the search of the residence or

discovery of the evidentiary items, and therefore was not an independent source (Doc. #205, pp. 24-28).

The Court agrees, and adopts this portion of the Report and Recommendation.  The Task Force investigation played no role in the actual activities at the residence on July 28, 2009.  Additionally, it is speculation at best whether the Task Force investigation would ever have resulted in a search of the residence or, even if there was such a search, whether the items found on July 28, 2009, would have been present on a later date.

## C.  Initial Entries By Deputy Roberts and Deputy Canfield

The relevant, credible facts related to the initial entries into the residence are summarized as follows:  In checking outstanding arrest warrants, Deputy Corey Roberts (Deputy Roberts) found that there were two felony violation of probation warrants for Jason Bergin ("Jason Bergin" or Bergin) for obtaining a controlled substance by fraud.  Deputy Roberts learned from another deputy where Bergin lived, and went to that residence with two other deputies to arrest Bergin.  The deputies arrived at approximately 12:30 a.m. on July 28, 2009.  Deputy Roberts asked a female to step off the front screened-in porch, and then he walked through the screen doorway and knocked first on sliding glass doors and then on another door of the trailer.  The door was opened by Robert Powner (Powner), and Deputy Roberts asked to speak to "Jason."  After Powner hesitated, Deputy Roberts saw Jason Bergin

poke his head around the corner inside the trailer.  Deputy Roberts instructed Bergin to step out onto the porch, which he did.  At approximately 12:40 a.m., Deputy Roberts told Bergin he had a felony warrant and that Bergin was under arrest, and placed handcuffs on him.  The arrest warrant was confirmed through the Sheriff's Office computer system at approximately 12:54 a.m.

Jason Bergin was not wearing anything on his feet, and asked to go into the house for socks.  Deputy Roberts denied this request, and said the officers would get the socks or Bergin could go without socks.  Bergin asked Deputy Christopher Canfield (Deputy Canfield) to get him some socks, and described where the socks were located inside the trailer.

Deputy Canfield entered the trailer, obtained the socks, and noticed a water bong used to smoke narcotics on the floor underneath an end table next to the bed.  Deputy Canfield walked over to it and looked at it.  As he did so, he observed a spoon with white residue on it, some syringes, and an empty pill bottle in a partially open drawer of the end table.  As Deputy Canfield turned, he saw more syringes on a television stand.  Deputy Canfield recognized all the items as drug paraphernalia.  Deputy Canfield then took the socks outside the trailer and gave them to Jason Bergin (either on the screened-in porch, according to Deputy Canfield, or at the police vehicle, according to Deputy Roberts).

Deputy Canfield then re-entered the house to reinspect the same items he had seen in order to verify that they were drug paraphernalia.  He did not touch any of the items, and did not inspect any other portion of the residence.  Deputy Canfield then left the residence and called his sergeant.  Deputy Canfield did not thereafter re-enter the residence.  Everyone at the scene was free to leave, but were not allowed to enter the residence.

**(1)  Entry Into Screened Porch Area**

Defendants argue that Deputy Roberts violated the Fourth Amendment when he entered the screened-in porch area to knock on the door.  The Report and Recommendation correctly rejects this argument (Doc. #205, p. 29, n.6).  Even in the absence of any type of warrant, officers may approach a residence and knock on the door for legitimate police purposes unconnected with a search of the premises, United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006); United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000) and may tell the suspect to exit the residence.  Knight v. Jacobson, 300 F.3d 1272, 1277-78 (11th Cir. 2002).  The Supreme Court drew a "firm line" at the threshold of the home, not the front porch.  Payton v. New York, 445 U.S. 573, 590 (1980); see also United States v. Larson, 63 Fed. Appx. 416, 424 (10th Cir. 2003).  The Fourth Amendment was not violated when the officer entered the porch area, and defendants' objections to the contrary are overruled.

Alternatively, the Court will assume that the screen-enclosed front porch constituted a portion of the home to which there was a reasonable expectation of privacy, either as curtilege, United States v. Dunn, 480 U.S. 294, 300 (1987)[1], or as a component of the house itself within the meaning of Payton.  See McClish v. Nugent, 483 F.3d 1231, 1241-42 (11th Cir. 2007)(Payton created a firm line delimiting a zone of privacy defined by the "unambiguous physical dimensions of an individual's home.")  The Court will further assume that the screen door to that porch was the "threshold" referred to in Payton.  With these assumptions, the officer's entry into the screened-in porch was nonetheless lawful.  There were two outstanding felony arrest warrants against Jason Bergin for violation of probation.  The officers could lawfully enter the house to arrest defendant because there was a valid outstanding arrest warrant, the location was defendant's residence, and defendant was inside the residence.  United States v. Bennett, 555 F.3d 962, 965 (11th Cir. 2009); United States v. Louisuis, 294 Fed. Appx. 573, 576 (11th Cir. 2008).  Therefore, even assuming the porch is a protected portion of the residence, the entry into the porch area was nevertheless lawful.

---

[1]United States v. Dunn, 480 U.S. 294, 300 (1987)(Fourth Amendment protects the curtilage of a house; extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself; central component of this inquiry is whether the area harbors the intimate activity associated with the sanctity of a person's home and the privacies of life).

Jason Bergin stepped onto the porch at Deputy Roberts' instruction and was arrested on the outstanding warrants.  No defendant challenges the arrest, but all challenge the officers' subsequent entries into the residence.  Because Jason Bergin was arrested outside his residence, the existence of arrest warrants cannot justify entry (or further entry, if the porch was a protected portion of the residence) into the residence after the arrest.

### (2) Entry Into Residence by Deputy Canfield (First Entry)

The Court agrees with, and adopts, the findings of fact and conclusions of law of the Report and Recommendation with regard to the first entry into the residence by Deputy Canfield (the First Entry) (Doc. #205, pp. 28-30.)  An officer is not required to allow an arrestee to re-enter his residence unaccompanied by an officer, Washington v. Chrisman, 455 U.S. 1, 5-7 (1982), and Deputy Roberts acted well within his authority in giving Bergin the option of proceeding without socks or having another deputy retrieve the socks.  Bergin made his choice, and his voluntary consent excused the warrant requirement and resulted in an entry which was consistent with the Fourth Amendment.  Georgia v. Randolph, 547 U.S. 103, 109 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Wright, 324 Fed. Appx. 800, 803 (11th Cir. 2009).  Defendants' objections to the contrary are overruled.

Deputy Canfield entered the residence at Bergin's direction and with his consent to obtain a pair of socks, and in doing so observed but did not seize various items of drug paraphernalia. The entry was lawful and the observations of the drug paraphernalia did not constitute an independent search. <u>Arizona v. Hicks</u>, 480 U.S. 321, 324-25 (1987). Since the entry and observations were constitutional, they cannot taint any of the subsequent events. <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1315 (11th Cir. 2009). Defendants' objections to the First Entry into the residence by Deputy Canfield are overruled.

### (3) Second Entry Into Residence by Deputy Canfield (Second Entry)

Deputy Canfield did not seize the items during his inital entry, but rather left the residence with only the socks. Immediately after giving Jason Bergin the socks, Deputy Canfield re-entered the residence (the Second Entry) to further inspect what he had observed during his initial entry. The government has provided no justification for this re-entry, arguing instead that because nothing was seized there is nothing to suppress (Doc. #192, p. 28.) The magistrate judge found that the Second Entry "appears" to be a violation of the Fourth Amendment (Doc. #205, p. 30), and then stated:

> However, Dep. Canfield did not see additional contraband during the second entry nor did he seize or destroy any of the contraband noted during the first consensual entry into the residence. Thus, the challenged evidence is

admissible because it was obtained from the lawful
initial entry, and not from the second warrantless entry.

(Doc. #205, pp. 30-31.)   At oral argument the government
essentially conceded this entry was unlawful.

An entry into a residence cannot be justified on the basis
that there was nothing physically seized and therefore no violation
of the Fourth Amendment.  The Fourth Amendment can be violated even
if there are no physical product of an unlawful entry.  United
States v. Gonzalez, 71 F.3d 819, 829 (11th Cir. 1996), abrogated on
other grounds, Arizona v. Gant, 129 S. Ct. 1710 (2009).
Observations made in the course of unlawful activity and the
knowledge gained therefrom are products of a constitutional
violation which are subject to suppression.  Crews, 445 U.S. at
470, citing McGinnis v. United States, 227 F.2d 598 (1st Cir.
1955)(testimony about observations made during illegal search
should be suppressed, as well as the physical items seized).  "The
exclusionary rule prohibits introduction into evidence of tangible
materials seized during an unlawful search, and of testimony
concerning knowledge acquired during an unlawful search."  Murray
v. United States, 487 U.S. 533, 536 (1988)(citations omitted.)

Deputy Canfield testified that he recognized the items as drug
paraphernalia on sight during the First Entry, but re-entered the
residence to make sure the items were contraband.  The Court finds
that Deputy Canfield had at least probable cause to believe the
objects were contraband at the time of the initial observations.

See, e.g., Wright, 324 Fed. Appx. at 803-04.  Although he did not
do so, this allowed Deputy Canfield to seize the items under the
plain view exception to the warrant requirement.  Minnesota v.
Dickerson, 508 U.S. 366, 375 (1993)("Under [the plain view]
doctrine, if police are lawfully in a position from which they view
an object, if its incriminating character is immediately apparent,
and if the officers have a lawful right of access to the object,
they may seize it without a warrant.")[2]; Chrisman, 455 U.S. at 9.
At least one circuit allows re-entry to seize drug paraphernalia
seen in plain sight during an initial entry.  United States v.
Varner, 481 F.3d 569, 572-73 (8th Cir. 2007); United States v.
Arcobasso, 882 F.2d 1304, 1305 (8th Cir. 1989).  But the re-entry
in this case was not for the purpose of seizing the evidence
observed during the first entry, but rather was Deputy Canfield's
attempt to confirm his belief that the items were contraband by
taking a second look.  There was no lawful basis for a re-entry to
take a second look, and the Court finds the Second Entry violated
of the Fourth Amendment.

The "challenged evidence" is the observations made during the
First Entry into the residence.  The Report and Recommendation
found this evidence to be admissible (Doc. #205, pp. 30-31) and the

---

[2]An object's incriminating character is immediately apparent
if there is probable cause to believe the object is contraband.
Dickerson, 508 U.S. at 375; Hicks, 480 U.S. at 326; Texas v. Brown,
460 U.S. 730, 741 (1983).

Court agrees, since subsequent illegal conduct cannot taint the prior lawful observations. Crews, 445 U.S. at 475 ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.")

However, the observations made during the unlawful Second Entry, although merely redundant, are not admissible. Segura, 468 U.S. at 804 ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.")  With this clarification, the Court adopts the Report and Recommendation as to the Second Entry.  Any observations by Deputy Canfield made during the Second Entry are suppressed. Crews, 445 U.S. at 470.

## D. Another Entry By Other Officer(s) into Residence (Third Entry)

Defendants assert that at least one officer made an entry into the residence after Deputy Canfield's Second Entry and prior to the entry of Detective Rodrigo pursuant to the consent given by defendant Carey Bergin.  This additional entry (the Third Entry), defendants assert, was unlawful.  The Report and Recommendation does not make specific findings as to such an entry.  The Court supplements the Report and Recommendation as follows.

None of the officers testified that they entered the residence after the Second Entry by Deputy Canfield, and all denied knowledge

of such an entry.  (Doc. #186, pp. 83, 85-86, 125, 150-51, 192, 194.)  Defendants point to two primary factors to support the factual existence of such an entry.  First, Detective Pete Rodrigo asked Carey Bergin for consent to open a safe in the residence, and could not have known about such a safe unless some officer had made such a re-entry and seen the safe.  Second, the testimony of two defense witnesses was that officers were going in and out of the residence prior to the arrival of Carey Bergin at the scene.

The magistrate judge discounted the testimony of the two witnesses that officers were in and out of the residence.  (Doc. #205, pp. 22-24).  The Court finds the reasons for such credibility choices appropriate, and discounts their testimony to the extent that it reflects entries other than those found by the Court in this Opinion and Order.  The officers' discussion of the existence of the safe, however, is more problematic.

After his second entry, Deputy Canfield called his superior, Sergeant James Magas, to report his observations in the residence (Doc. #186, p. 112.)  Sergeant Magas arrived at the residence thereafter, as did Lieutenant Hedrick about ten minutes later (Doc. #186, p. 85.)  At some time prior to 4:00 a.m., Sergeant Magas called narcotics Detective Rodrigo and told him to respond to the residence in reference to drugs and drug paraphernalia inside the residence.  Detective Rodrigo testified that Sergeant Magas told him during this call that the officers went to arrest Jason Bergin

and found drug paraphernalia with drugs inside the room and possibly more drugs inside a safe. (Doc. #186, p. 167.) Detective Rodrigo further testified that Sergeant Magas told him an officer had observed the safe, but Detective Rodrigo did not know which officer made the observation (Doc. #186, pp. 193-95). Sergeant Magas did not testify at the suppression hearing, so there is no information from him as to the identity of the officer who observed the safe.

Detective Rodrigo arrived at the residence at about 4 a.m. Detective Rodrigo's duties were to further investigate what was inside the residence, to speak to Carey Bergin, and to find out what was happening. (Doc. #186, p. 161.) Detective Rodrigo testified that he knew from his briefing from Sergeant Magas that it was probable that some other items were inside a safe. At the scene, Detective Rodrigo was briefed by Deputy Canfield (Doc. #186, pp. 172, 175-76, 178-79, 182-83.) Detective Rodrigo then made contact with Carey Bergin and asked Carey Bergin about the safe inside the residence and asked to go inside the trailer. Carey Bergin walked Detective Rodrigo into the residence and ultimately opened the safe. Detective Rodrigo observed drug paraphernalia around the room (Doc. #186, p. 182) and ultimately the contents of the safe.

Defendants argue that the undisputed knowledge by Detective Rodrigo of the existence of the safe indicates that there must have

been another entry into the residence by an officer. Deputy Canfield testified that he told Detective Rodrigo what he had seen in the residence (Doc. #186, p. 116), but also testified that he did not see a safe during either of his entries into the residence (Doc. #186, pp. 127, 129-30, 140) and received no information about a safe from another officer (Doc. #186, p. 151.) Deputy Roberts was not present at the scene when Detective Rodrigo arrived (Doc. #186, p. 66, 84), but in any event had not observed anything inside the residence while he was at the front door (Doc. #186, p. 74). Deputy Roberts testified he did not think Deputy Foster was on the porch at the time of the arrest (Doc. #186, p. 66), and Deputy Canfield testified that Deputy Foster did not do anything (Doc. #186, p. 128.) Assuming the truthfulness of the officers' testimony, as did the magistrate judge, that leaves only an entry by another officer who observed the safe and relayed the information to Sergeant Magas or another officer.

To rebut the reasonable inference that there was another entry into the residence during which the safe was observed, the government relied upon testimony by Detective Rodrigo and photographs of the residence. (Doc. #192, pp. 28-29.) Detective Rodrigo testified that the safe could be immediately seen from inside the bedroom because the closet door was open (Doc. #186, p. 166), and that the safe could be seen standing on the porch (Doc. #186, pp. 203-05). Detective Rodrigo also testified, however, that

he did not think the closet door was open when the first deputies arrived. (Doc. #186, p. 187.) Additionally, Detective Rodrigo was not present when the officers were on the porch, there was no testimony that any officer actually had observed the safe from the porch area, and neither officer who admits to being in that position (Deputies Roberts and Canfield) saw the safe. The government's reliance upon the photograph, Government's Exhibit Five, is not convincing because the photograph, taken when the search warrant was being executed, depicts the room during the daytime, not near the time of the arrest on the porch, and depicts the view from inside the bedroom, not from the front porch. Further, there is no evidence that the closet door was open when the officers were at the porch door.

There is no doubt that Detective Rodrigo was told about the safe prior to his arrival at 4 a.m., and there is no reasonable explanation for such knowledge other than another entry into the residence by an officer. The Court finds that the circumstantial evidence establishes such other entry into the residence. At oral argument, the government conceded that the record supported such a finding. Since there is no evidence that such an entry was pursuant to a search warrant, and there is a presumption that entry into a residence without a search warrant is unlawful, the Court finds that this Third Entry violated the Fourth Amendment. The only new information gathered as a result of this illegal entry,

knowledge of the existence of a safe, will therefore be suppressed. Murray, 487 U.S. at 536 ("The exclusionary rule prohibits introduction into evidence of . . . testimony concerning knowledge acquired during an unlawful search.")

**E. Entry Pursuant to Consent by Carey Bergin (Fourth Entry)**

After his arrival at the residence, Detective Rodrigo spoke with Carey Bergin briefly (about ten minutes) and inquired about the safe.  She informed him that there were pills inside the safe which belonged to Robert Powner.  Detective Rodrigo obtained her permission to enter the residence with her and have her open the safe.  Pursuant to that permission, Detective Rodrigo entered the residence (the Fourth Entry), and after Carey Bergin opened the safe, observed but did not seize its contents.  Detective Rodrigo believed that he did not need the consent because the officers who preceded him had obtained consent, but nonetheless obtained consent from Carey Bergin.  (Doc. #186, pp. 191-92.)  Defendants argue that the statements and consent given by Carey Bergin to Detective Rodrigo were tainted by the prior illegal entries into the residence, rendering the Fourth Entry into the residence and the search of the safe unlawful.[3]

---

[3]At oral argument, the government, without necessarily conceding taint, stated that it would not introduce the statement or consent by Carey Bergin at trial, or any observations by Detective Rodrigo.  Since the issue of taint may impact the lawfulness of subsequent police conduct, the Court must complete its analysis despite the government's agreement not to introduce
(continued...)

The Report and Recommendation correctly found that there was no taint from the First Entry because that entry was lawful. (Doc. #205, p. 32.)  While the Second Entry was unlawful, it is clear that it did not taint defendant Carey Bergin's subsequent consent because nothing was observed that had not been lawfully observed during the First Entry.  The Third Entry was unlawful and did result in additional information – knowledge of the existence of a safe in the closet.  The issue, therefore, is whether the Third Entry tainted Carey Bergin's consent[4] and rendered the Fourth Entry and the search of the safe unlawful.

The Court is required to make two separate inquires where a consent to search follows illegal police activity.  "First, a court must determine whether the consent was voluntary.  Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'-the product of an illegal entry."  United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007)(citation omitted).  "This two step approach is mandatory, and the government bears the burden on both issues."  Id.

---

[3](...continued)
this evidence at trial.

[4]This is not a situation, such as in Georgia v. Randolph, 547 U.S. 103 (2006), where one resident consents and the other resident refuses.  Other than in regards to the socks, Jason Bergin was not asked for consent to enter the residence, and had been arrested and removed from the scene prior to the arrival of Carey Bergin.

Defendants challenge the voluntariness of Carey Bergin's consent.  The voluntariness of a consent to search is a factual assessment and depends on the totality of the circumstances. United States v. Drayton, 536 U.S. 194, 207 (2002); United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).  In evaluating voluntariness, the Court examines several factors, including the person's custodial status, the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  Purcell, 236 F.3d at 1281-82.  Applying these principles, the magistrate judge determined that the government had established that Carey Bergin's consent to Detective Rodrigo was voluntary (Doc. #205, pp. 33-34.) The Court agrees, and adopts this portion of the Report and Recommendation.

The second determination is whether the consent was the product of the illegal Third Entry and its resulting observation of the safe.  This focuses on causation:  "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  United States v. Santa, 236 F.3d 662, 676-77 (11th Cir. 2000) (quoting Wong Sun v. United States,

371 U.S. 471, 488 (1963)); <u>Delancy</u>, 502 F.3d at 1309.  "This inquiry is fact-sensitive, and no single fact is decisive." <u>Lopez-Garcia</u>, 565 F.3d at 1315; <u>Delancy</u>, 502 F.3d at 1309 (citing <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975)).  The primary but non-exclusive factors which guide the inquiry as to whether consent is tainted by prior illegal conduct are (1) temporal proximity of the consent to the illegal conduct, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.  <u>Delancy</u>, 502 F.3d at 1309-10; <u>Lopez-Garcia</u>, 565 F.3d at 1315.  While these factors provide a useful structure, the Eleventh Circuit has cautioned that the underlying question involves a pragmatic evaluation of the extent to which the illegal police conduct caused the person's consent.  <u>Delancy</u>, 502 F.3d at 1310.

Only the Third Entry could possibly have tainted Carey Bergin's consent.  The residence itself had been effectively seized (because all occupants and persons with the right to enter, including Carey Bergin, were still being excluded), but that seizure was reasonable at the time the consent was given and therefore not unlawful.  <u>Segura</u>, 468 U.S. at 806; <u>Illinois v. McArthur</u>, 531 U.S. 326, 331 (2001).  Crediting Carey Bergin's argument that the evidence established she arrived at the residence at approximately 3:30 a.m. (Doc. #196, p. 10), she was prevented

from entering her residence for approximately 30 minutes before speaking with Detective Rodrigo.

Because no officer admitted to the Third Entry, or to seeing another officer make that entry, the record contains no evidence as to the entry itself. The record does not establish when the entry occurred, therefore the issue of temporal proximity to the consent cannot be determined precisely. The most we know is that the Third Entry occurred sometime after Deputy Canfield's Second Entry (between 12:40 a.m. and 12:54 a.m) and shortly before 4:00 a.m., the approximate time Detective Rodrigo was told about the safe by Sergeant Magas. The record establishes that the consent was given after Detective Rodrigo arrived at the residence at 4:00 a.m., debriefed Deputy Canfield, and spoke to Carey Bergin for about ten minutes, but before 5:00 a.m., when Detective Rodrigo called Detective Nolan after the safe was opened. Thus, anywhere from less than an hour to three to four hours elapsed between the unlawful Third Entry and the consent. Given the low-key interaction between Detective Rodrigo and Carey Bergin, this is not the most important factor. Delancy, 502 F.3d at 1310-11.

Intervening circumstances are "events that interrupt the causal connection between the illegal act and the possibly tainted consent or confession." Delancy, 502 F.3d at 1311. The Eleventh Circuit has stated that it is an intervening circumstance that a defendant's statement is taken by someone other than the person

involved in the illegality.  Lopez-Garcia, 565 F.3d at 1316.  It is clear that Detective Rodrigo was not the officer who made the illegal Third Entry.  Nonetheless, the Court finds these circumstances to be of relatively little significance since Carey Bergin was unaware of the identity of the offending officer at the time of her consent.  No other intervening circumstances have been identified between the Third Entry and the consent by Carey Bergin.

There is no direct evidence as to the purpose of the Third Entry.  There seems to be no reason, however, to suspect that the Third Entry was motivated by an ulterior purpose of obtaining consent from Carey Bergin.  The officers could not have known she would return to her residence, did nothing to obtain her presence at the residence, and apparently did not enter the residence in her presence.  Thus, there is no evidence that the Third Entry, while unlawful, was for an unlawful purpose.  Delancy, 502 F.3d at 1312.

The record also is mostly silent as to any flagrant behavior during the illegal Third Entry.  The record does establish, however, that none of the items observed in plain view during this entry were seized.  Instead, they were left in the residence and the information was reported to Sergeant Magas for further action.

It is clear, however, that the officers exploited the observation of the safe made during the Third Entry.  It is a reasonable inference that it was the observation of the safe which prompted Sergeant Magas to call a narcotics detective (Detective

Rodrigo) to the scene. Upon his arrival, Detective Rodrigo initiated his conversation with Carey Bergin by reference to the safe, and expressly requested her to enter the residence and open the safe for him. Whether officers exploit the illegal evidence is important evidence as to whether they act in flagrant disregard of a defendant's rights. Delancy, 502 F.3d at 1313. Delancy noted that "[i]f this had been a situation where [defendant] was 'face to face with the incriminating evidence [obtained by a prior illegal search] and able to see that the police had firm control over her home,' the consent may have been tainted." Delancy, 502 F.3d at 1313, quoting Holloway v. Wolff, 482 F.2d 110, 115 (8th Cir. 1973). While that situation was not present in Delancy, it is present in this case. See also United States v. Quintana, 594 F. Supp. 2d 1291, 1305 (M.D. Fla. 2009)(emphasizing that use of information obtained during prior illegal search to persuade defendant to consent to full search of residence weighed in favor of suppression).

The final factor found relevant in Delancy is that the consent was from a third party, not the defendant. Delancy, 502 F.3d at 1314. Carey Bergin is now a defendant, of course, but she was not at the time of the consent. While her Fourth Amendment rights were violated *in absentia* by the Third Entry, she was not treated as a suspect at any time during the events of July 28, and was not

arrested until September 22, 2009, after being named in a federal indictment.

After considering the circumstances in their entirety, the Court finds that the consent by Carey Bergin was the product of information gained during the unlawful Third Entry - knowledge of the existence of the safe.  The Court finds that the government has not established that Carey Bergin's consent was sufficiently an act of free will to purge the primary taint of the unlawful Third Entry, or that the causal connection has been so attenuated as to dissipate the taint.  The officer exploited his knowledge of the safe in order to converse with Carey Bergin and obtain her consent to enter the residence and open the safe[5].  Thus, the Fourth Entry and search of the safe at that time cannot be justified on the basis of consent alone, and there is no other legal basis for that entry.  Accordingly, the statements by Carey Bergin to Detective Rodrigo, and the observations of any officer in the residence pursuant to this consent, will be suppressed.  Crews, 445 U.S. at 470.  Additionally, the observations of the contents of the safe will be suppressed, there being no applicable exception to the exclusionary rule and no reason the exclusionary rule should not be applicable in this context.

---

[5]Under Florida law, "[t]he fellow officer rule imputes the knowledge of one officer in the chain of investigation to another officer."  Raucho v. State, 915 So. 2d 278, 281 n.1 (Fla. 4th DCA 2005).  See also United States v. Leon, 468 U.S. 897, 923 n.24 (1984).

**F.   Protective Sweep Entry (Fifth Entry)**

After Detective Rodrigo observed the contents of the safe, he called a "pills unit" detective, Detective Nolan.  Detective Nolan testified that he arrived at the residence at approximately 6 a.m., having been called by Detective Rodrigo at about 5 a.m.  After being briefed by Detective Rodrigo as to what had occurred, Detective Nolan decided to make sure the residence was clear in preparation for obtaining a search warrant.  Detective Nolan approached Carey Bergin, who was sitting on the front porch, and asked if anyone was inside.  Carey Bergin said no.  Detective Nolan said he was going to clear the residence so he could get a search warrant if necessary, and Carey Bergin said he could search the residence.  Detective Nolan declined this consent, in order to make sure the search was done properly (Doc. #186, pp. 211-12.) Detective Nolan entered the residence (the Fifth Entry) and found no one inside.  Detective Nolan did not touch anything, but did observe drug paraphernalia in plain view.

A protective sweep is a recognized exception to the warrant requirement.  "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 337 (1990).  These principles have been

extended to situations where the arrest does not occur literally in the home.  United States v. Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991)(en banc)(arrest in garage, protective sweep of residence); United States v. Legette, 260 Fed. Appx. 247, 249-50 (11th Cir. 2008).

None of the requirements for a valid protective sweep are satisfied in this case.  The arrest of Jason Bergin had occurred almost six hours before, officers had had control of the residence since the arrest and none had seen an immediate need to enter the residence, there was no reasonable belief that anyone was still in the residence, and there were no specific and articulable facts to support the need for a protective sweep.  See, e.g., United States v. Chaves, 169 F.3d 687, 691-92 (11th Cir. 1999). Accordingly, the plain view observations of drug paraphernalia by Detective Nolan during the protective sweep were unlawful because he was not lawfully on the premises when he made the observations. These observations are suppressed, Crews, 445 U.S. at 470[6], although like the Second Entry the observations are simply redundant of those during the lawful First Entry.

---

[6]The testimony also suggested that Carey Bergin gave a separate consent for this entry, but it was refused by Detective Nolan (Doc. #205, p. 9.)  The Court finds that this consent is tainted by both the Third Entry and the Fourth Entry, without any showing of an independent source or other exception to the exclusionary rule, and without any reason the exclusionary rule should not be applied in this context.

## G.  Entry Pursuant to Search Warrant (Sixth Entry)

After his protective sweep, Detective Nolan asked a couple of deputies to make sure no one entered the residence and began writing the search warrant and affidavit.  These were signed by a state court judge at approximately 1 p.m.

Officers executed a state Search Warrant on the residence at approximately 2 p.m. (the Sixth Entry), seizing a number of items (Doc. #205, p. 9.)  Defendants argue that the search warrant was issued based upon knowledge gained during prior illegal searches, and therefore should itself be suppressed as the fruit of the poisonous tree, along with all evidence found during and as the result of the execution of the search warrant.[7]  Defendants also argue that the officers secured the residence for too long a time period prior to obtaining a search warrant.

### (1) Excessive Length of Time Residence Secured

Defendants argue that the officers acted unreasonably in the length of time they maintained control of the residence prior to the execution of the search warrant.  (Doc. #196, pp. 4-5).  This, defendants argue, resulted in an unlawful seizure of the residence and voids the search warrant that was ultimately obtained.  This issue was not addressed in the Report and Recommendation.

---

[7]At oral argument, the government stated it would not seek to admit as evidence any of the matters seized from the safe, but only ledgers notes, tallies and computer related equipment.

Defendant Jason Bergin was arrested at approximately 12:40 a.m., and the underlying arrest warrants were confirmed at approximately 12:54 a.m.  Defendant Jason Bergin was removed from the scene at approximately 1:30a.m.  Defendant Carey Bergin arrived at the scene anywhere from 2 a.m. to shortly before 4 a.m., although the Court agrees with her attorney's argument that the time was probably closer to 3:30 a.m.  Various officers maintained control of the premises until approximately 4 a.m., when Detective Rodrigo arrived.   Detective Rodrigo obtained consent from Carey Bergin to enter the residence with her to open the safe, and entered the residence after speaking with Carey Bergin for about ten minutes.   (Doc. #186, p. 166.)   Detective Rodrigo called Detective Nolan after about an hour to report the contents of the safe (Doc. #186, p. 171-72) (i.e., about 5 a.m.), and left the premises about 6 a.m., after Detective Nolan arrived (Doc. #186, p. 184.)  Shortly after 6 a.m. Detective Nolan made the decision to obtain a search warrant, then caused the residence to be secured until a search warrant was obtained, which was at approximately 1 p.m.  The search warrant was executed at about 2 p.m.  During the entire time none of the defendants (or anyone else) was allowed to enter the residence, with the exception of Carey Bergin in the company of Detective Rodrigo.  Thus, the residence was controlled by the officers for approximately 12 hours until a search warrant was obtained and 13 hours until the search warrant was executed.

Because the occupants were aware of the investigation, the agents were entitled to secure the residence to prevent the destruction of evidence.  See United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991); United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990).  The Supreme Court has held "that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."  Segura, 468 U.S. at 810.  Securing a residence must be reasonable, however, which requires the balancing of the privacy-related and law enforcement-related concerns.  Illinois v. McArthur, 531 U.S. 326, 331 (2001).  In making this determination, the Court considers four factors: (1) whether the police had probable cause to believe that the residence contained evidence of a crime or contraband; (2) whether the police had good reason to fear that, unless restrained, the evidence or contraband would be destroyed before the police could return with a warrant; (3) whether the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and (4) whether the police imposed the restraint for a limited period of time, i.e., whether the time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.  McArthur, 531 U.S. at 331-32.

The Court applies the four factors as follows in this case. First, the officers had probable cause to believe the residence contained contraband.   The drug paraphernalia was seen in plain view by Deputy Canfield when he first entered the residence, and this observation was not tainted by any of the subsequent police conduct.   Second, it was reasonable for the officers to fear that unless the residence was secured either Powner or Carey Bergin would destroy the contraband.   The contraband was in plain sight and its significance was obvious to anyone.   Indeed, Powner's version of the facts has him concealing all drug paraphernalia prior to the officer's entry.   Third, the record establishes that the officers made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy.   The officers twice declined immediate seizures in favor of a more conservative approach, and ultimately for judicial review and a warrant.   Fourth, the time period was not far longer than reasonably necessary for the police, acting with diligence, to obtain a warrant.   The Supreme Court has found that seizure of a residence for 19 hours for that purpose was not unreasonable under the circumstances, and that it was "reasonable to assume that judicial officers are not as readily available for consideration of warrant requests" between the hours of 10 p.m. and 10 a.m.   Segura, 468 U.S. at 813-16.   Similarly, the Eleventh Circuit found a 20 hour seizure of a boat while officers attempted to obtain consent

from a foreign country did not taint the consent. United States v. Sainsbury-Suarez, 797 F.2d 931, 933-34 (11th Cir. 1986). The Court finds that the length of time the premises were secured prior to the arrival of a search warrant in this case was not unreasonable and did not itself violate the Fourth Amendment.

**(2)  Search Warrant**

A search warrant issued after a Fourth Amendment violation can be tainted by the violation or it can be an independent source which purges the taint of the violation. United States v. Glinton, 154 F.3d 1245, 1254-55 (11th Cir. 1998). A search warrant which is valid without reliance upon observations or information from the illegal conduct is an independent source which breaks the causal link between the illegal conduct and the final search or seizure. United States v. Davis, 313 F.3d 1300, 1304 (11th Cir. 2002).

To be valid, the Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. The Supreme Court has held that this requires only three things: (1) Search warrants must be issued by neutral, disinterested judicial officers; (2) those seeking the search warrant must demonstrate to the judicial officer their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense; and (3) the search warrant

must particularly describe the things to be seized as well as the place to be searched. Dalia v. United States, 441 U.S. 238, 255 (1979)(citations omitted). The first requirement is not at issue in this case.

**(a) Probable Cause for Evidence of Particular Offense**:

Evidence obtain in violation of the Fourth Amendment which is included in a search warrant affidavit may invalidate a search warrant if it is critical to establishing probable cause for issuance of a search warrant. United States v. Karo, 468 U.S. 705, 720 (1984). Following the procedure in Franks v. Delaware, 438 U.S. 154, 172 (1978), the court redacts tainted evidence and determines if sufficient untainted evidence is present in the affidavit to establish probable cause. Karo, 468 U.S. at 720. Thus, where "the search warrant affidavit is based on information acquired as a result of an illegal entry, [the Court] must look to whether other information provided in the affidavit is sufficient to support a probable cause finding." United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999), citing Glinton, 154 F.3d at 1254-55. See also State v. Hunwick, 434 So. 2d 1000, 1001 (Fla. 4th DCA 1983). If, after deleting information obtained from the illegal conduct, sufficient facts remain to support probable cause, suppression is not required, Karo, 468 U.S. at 719-721; Chaves, 169 F.3d at 692-93; Davis, 313 F.3d at 1304; United States v. Whaley, 779 F.2d 585, 589 n.7 (11th Cir. 1986), *provided* that the officers'

decision to seek the warrant was not prompted by what they had seen during the unlawful entry.  Chaves, 169 F.3d at 693, citing Murray v. United States, 487 U.S. 533, 542 (1988); United States v. Hill, 338 Fed. Appx. 855, 857 (11th Cir. 2009).

The Court has found that the First Entry into the residence by Deputy Canfield was lawful, and that his observations of various items of drug paraphernalia were lawful.  The Court agrees with the Report and Recommendation that there was no taint of the initial observations by Deputy Canfield (Doc. #205, p. 36.)  The Court has found the Second Entry, Third Entry, Fourth Entry, and Fifth Entry by various officers were unlawful, and disagrees with the Report and Recommendation as to the lack of taint from this other police conduct (Doc. #205, pp. 35-36).  The Court therefore does not accept this portion of the Report and Recommendation.  The information obtained from the Second, Third, Fourth and Fifth Entries must be redacted from the search warrant Affidavit.

In his Affidavit for Search Warrant, Detective Nolan asserted that he had probable cause to believe that there was a violation of Florida law relating to the unlawful possession of a blank prescription form, in violation of Fla. Stat. § 893.13(7)(a)(7), and that "evidence connected with the crime" was currently located within the residence.  The Affidavit then sets forth its probable cause for "the above named crimes".  The first unnumbered paragraph states Detective Nolan's position and background as a law

enforcement officer, and is not subject to redaction.  The government's suggested redactions results in the remainder of the Affidavit stating:

On July 28th, 2009, Detective Nolen was contacted by Lee County Sheriffs Office, Special Investigations Division, Narcotics unit, Detective Peter Rodrigo. Detective Rodrigo requested Detective Nolen's assistance at 20494 Sherrill Lane, Estero.

Upon Detective Nolen's arrival he came in contact with Detective Rodrigo.  Detective Rodrigo informed Detective Nolen that he was contacted by the Lee County Sheriffs Office, Delta district patrol officers in reference to the aforesaid location.  The patrol officers told Detective Rodrigo that they had arrested Jason Bergin for an active warrant.  The patrol officers further advised that while inside the residence they observed drug paraphernalia; needles and pill bottles.

Detective Rodrigo responded to the aforesaid location and interviewed Jason Bergin's spouse, Carey Ann Bergin, date of birth: November 13, 1975.

On July 28, 2009, at approximately 06:30 a.m., Detective Nolen arrived at the residence on Sherrill Lane to continue the investigation. While Detective Nolen was compiling information for this warrant he came in contact with a white female, Susan Hamilton, at the aforesaid location.  Detective Nolen had probable cause for her arrest due to a prior investigation, where she passed a fraudulent prescription as genuine to the Walgreens pharmacy.  The prescription Hamilton passed was shown to be prescribed by Dr. Gerald Klein. Detective Nolen contacted Dr. Klein and confirmed the presceiption was indeed fraudulent.

On July 28, 2009, Detective Nolen and Members of the Lee County Special Investigations Division, Narcotics Unit secured Bergin's residence to contain the evidence still located inside.

The only criminal offense which is alleged in either the Affidavit or the Search Warrant is Fla. Stat. § 893.13(7)(a)(7).

Florida Statutes § 893.13(7)(a)(7) makes it unlawful for any person to

> possess a prescription form which has not been completed and signed by the practitioner whose name appears printed thereon, unless the person is that practitioner, is an agent or employee of that practitioner, is a pharmacist, or is a supplier of prescription forms who is authorized by that practitioner to possess those forms.

Fla. Stat. § 893.13(7)(a)(7). The probable cause requirement is therefore probable cause to believe that the evidence sought will aid in a conviction for this particular offense. Dalia, 441 U.S. at 255. A search warrant may issue for "mere evidence" of this offense, Warden v. Hayden, 387 U.S. 294 (1967), but only upon a showing of probable cause. Id. at 309.

Here, the patrol officers told Detective Rodrigo, who told Detective Nolen, who stated in the Affidavit, that the patrol officers had arrested Jason Bergin for an active warrant and that while inside the residence the patrol officers observed "drug paraphernalia, needles, and pill bottles." Overlooking the hearsay nature of the information, it is difficult to see how the observation of drug paraphernalia, needles, and pill bottles says something about the likely presence of blank prescription forms in the residence. "Drug paraphernalia" is a specifically defined term under Florida law, Fla. Stat. § 893.145 which, while broadly defined, does not include a blank prescription form.[8] Mere

---

[8]Given the broad definition of drug paraphernalia, and the (continued...)

possession of drug paraphernalia is not unlawful in Florida unless the person possesses the drug paraphernalia with the intent to use it.   Fla. Stat. § 893.147(1); Campbell v. State, 459 So. 2d 357 (Fla. 2d DCA 1984)(possession of item of ordinary use (scale) is not possession of drug paraphernalia without proof that item had been used in violation of law).   Similarly, neither "needles" nor "pill bottles" are *per se* illegal or necessarily require a prescription.

The only other substantive information in the search warrant affidavit is that while at the residence Detective Nolen came in contact with Susan Hamilton, a person for whom Detective Nolen had probable cause to arrest based upon a prior investigation during which Detective Nolan determined that Hamilton had passed a fraudulent prescription as genuine to the Walgreens pharmacy.   The Affidavit further recites that the prescription was shown to be prescribed by Dr. Gerald Klein, and Dr. Klein confirmed to Detective Nolen that the prescription was fraudulent.   This, however, does not add to probable cause as to the likely presence of blank prescriptions in the residence.   Other than coming in contact with Hamilton at the residence, the affidavit states nothing which connects Hamilton to the residence or its contents,

---

[8](...continued)
numerous factors which have been identified as bearing on the determination of whether an item is drug paraphernalia, Fla. Stat. § 893.146, an affidavit which states an officer observed "drug paraphernalia" states a conclusion and not a fact.

or connects her prior activity to the residence.[9]  Additionally, there is no indication of when Hamilton's activity had been conducted.[10]

In short, the search warrant affidavit alleges that police officers observed drug paraphernalia, needles and pill bottles in the residence, and another officer who came to the residence came in contact with a person who had previously passed a fraudulent prescription.  To issue a search warrant under the Fourth Amendment, a judge is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213, 238-39 (1983); Davis, 313 F.3d at 1303; Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002).  The redacted affidavit in this case clearly fails to meet this standard as to evidence of the possession of blank prescriptions, the only offense alleged in the search warrant.

---

[9]While unstated in the affidavit, the evidence established that Hamilton arrived at the residence by vehicle at about 3:30 a.m. while the residence was secured, and had never entered the residence.  No officer had seen Hamilton at the residence before that time.

[10]"Where undated information is factually interrelated with other dated information in an affidavit, it is permissible to infer that the events took place in close proximity to the dates that are given."  State v. Enstice, 573 So. 2d 340, 342 (Fla. 5th DCA 1990).  No such dated information relating to Hamilton's prior conduct is set forth in the affidavit.

### (b) Particularized Descriptions of Items to be Seized

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Marron v. United States, 275 U.S. 192, 196 (1927).

The Search Warrant contains an "Items To Be Searched For" section which states that the probable cause establishes that there is now being kept in the premises evidence which will link Jason Bergin and/or other person(s) to the "aforementioned charges."  It then states that the evidence believed to be within the residence included two specific types of pills, drug paraphernalia, copiers, blank copy paper, computers, and computer related equipment.  Based upon the redaction to the probable cause portion of the affidavit, the only items which would be subject to seizure under the Search Warrant would be "pills" and "drug paraphernalia".  "Drug paraphernalia" is insufficient to describe with reasonable particularity the items to be seized.  State v. Schrager, 472 So. 2d 896 (Fla. 4th DCA 1985)(holding comprehensive listing of specific items of drug paraphernalia sufficient).  Similarly, "pills" does not provide a searching officer with any guidance on what pills to seize as contraband and what pills not to seize.  A warrant which fails to sufficiently particularize the things to be

seized is unconstitutionally over broad, the resulting general search is unconstitutional, and any evidence so seized must be suppressed.  United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000).

**(c)  Motivation to Obtain the Search Warrant**

The evidence clearly shows that the decision to obtain a search warrant was motivated by the information discovered as the result of the illegal Fourth Entry - knowledge of the safe - and information discovered as the direct result in the Fifth Entry - observations that the contents of the safe included Roxicodone pills, prescription paper with actual scripts, credit cards under Jason Bergin's name, and money.  Deputy Canfield called his supervising sergeant (Sergeant Magas) because he observed drug paraphernalia in the residence.  Sergeant Magas called a narcotics detective (Detective Rodrigo) only after learning that the residence contained a safe.  Detective Rodrigo called a "pills unit" detective (Detective Nolan) about prescription fraud based upon what he had observed in the residence and safe, and told Detective Nolan exactly what he had seen (Doc. #186, p. 171). Detective Nolan decided to obtain a search warrant after arriving at the premises and being told of the contents of the safe.  There was no information regarding prescriptions in the residence, blank or otherwise, other than the tainted statement of Carey Bergin and the observation of the contents of the safe.  The Court finds that

the motivation to obtain a search warrant was the direct result of the unlawfully obtained knowledge that the residence contained a safe and the safe contained pills and prescriptions.

Accordingly, the Court finds that the search warrant was not an independent source of any evidence, but was itself tainted.  The officers' presence in the residence pursuant to the execution of the search warrant therefore was not lawful and cannot support the seizure of the ledgers or any other item.

## H.  Evidence Suppressed

Based upon the findings of facts and conclusions of law set forth above, the following items will be admissible or will be suppressed:

(1) Testimony about the observations by Deputy Canfield during the First Entry is admissible.

(2) Testimony about the observations by Deputy Canfield during the Second Entry is suppressed.

(3) Testimony about the observations by any officer during the Third Entry is suppressed.

(4) Testimony about the statements by Carey Bergin to Detective Rodrigo, her consent to enter the residence, and any observations made by officers inside the residence during the Fourth Entry are suppressed.

(5) Testimony about the statements by Carey Bergin to Detective Nolen at approximately 6 a.m. and Detective Nolen's

observations inside the residence during the Fifth Entry are suppressed.

(6) Testimony about observations by any officer during the Sixth Entry, and all tangible items seized by any officer, are suppressed.

### IV.   Further "Fruits"

In addition to the observations and items seized during the various entries, defendants argue that the Court should suppress a number of other evidentiary matters as being tainted by the Fourth Amendment violations.  With one exception, the Court declines to do so.

### A.   Recorded Statement by Carey Bergin on July 28, 2009

Carey Bergin gave a recorded statement to Detective Nolen at 1:56 p.m. outside the residence, while the search warrant was being executed.   Government's Exhibit 11.   Defendant Carey Bergin contends that her recorded statement should be suppressed because it was derived from the officers' illegal searches and seizures in the residence and that she was most likely high on drugs when she made her statement.   The Report and Recommendation found the statement was not tainted and was given voluntarily, and that Carey Bergin was not high on drugs when she made the statement.   (Doc. #205, pp. 36-38).   The Court accepts and adopts the Report and Recommendation finding that Carey Bergin was not high on drugs, and rejects the other two findings.

"Evidence, including verbal statements, obtained as a result of an unlawful search are subject to exclusion." <u>Parker v. Allen</u>, 565 F.3d 1258, 1291 (11th Cir. 2009), citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963). To be admissible, the statement must be both voluntary and untainted by the Fourth Amendment violation. <u>Brown v. Illinois</u>, 422 U.S. 590, 601-604 (1975). In determining whether a statement is tainted by a prior Fourth Amendment violation, the court determines whether the statement has been obtained by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. <u>United States v. Lopez-Garcia</u>, 565 F.3d 1306, 1314 (11th Cir. 2009), citing <u>United States v. Delancy</u>, 502 F.3d 1297, 1309 (11th Cir.2007). The relevant factors include whether <u>Miranda</u> warnings were given, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. <u>Kaupp v. Texas</u>, 538 U.S. 626, 632-33 (2003); <u>Parker</u>, 565 F.3d at 1290. "<u>Miranda</u> warnings do not, without more, dissipate the taint of an illegal seizure." <u>United States v. Santa</u>, 236 F.3d 662, 678 (11th Cir. 2000).

Carey Bergin's recorded statement to Detective Nolen on July 28, 2009, was not voluntary. Ms. Bergin conceded on tape that Detective Nolen had advised her of her <u>Miranda</u> rights, and that she agreed to give a recorded statement without the presence of an

attorney.   Government's Exhibit 11, p. 10.   Detective Nolen prefaced the interview by stating "Carey is a cooperatin' witness at this time, uh, in reference to her – husband Jason Bergin who has just been placed under arrest for a warrant." Id. Later, the following exchange took place:

> Det. Nolen: Is there anything you're feelin' that you should tell me right now but you're holdin' back because of, uh, you know, feelin' you might incriminate yourself?
>
> C. Bergin: No, I –
>
> Det. Nolen: This is basically your opportunity to tell your side.   You know, we're givin' you some kind of – some sort of immunity.

Id. at p. 21.   This promise of "some sort of immunity" requires a finding that Carey Bergin did not voluntarily, knowingly, and intelligently waive her Miranda rights, United States v. Lall, 607 F.3d 1277, 1282-84 (11th Cir. 2010), and, under the totality of the circumstances, the statement she made was not voluntary, Lall, 607 F.3d at 1285-88.

Additionally, the statement was tainted by the prior violations of the Fourth Amendment.   The recorded statement reflects that it was given while the search warrant was being executed, and referred to prescription pads which were observed during an earlier illegal entry and seized pursuant to a tainted search warrant.   There was neither a significant lapse of time nor

any intervening circumstance which could be said to have dissipated the effect of the illegality.  The agents' unlawful conduct in entering the residence on multiple occasions, even if not "flagrant," had no legal justification.

Accordingly, the recorded statement given to Detective Nolen was both involuntary and tainted by the violations of the Fourth Amendment.  Therefore, the government may not use this statement against Carey Bergin in its case in chief.

## B.  Federal Indictment and Arrest Warrants

Nine defendants, including the three who filed the motions now before the Court, were named in a federal Indictment (Doc. #3) filed on September 16, 2009.  It is undisputed that information which the Court has found was obtained in violation of these three defendants' Fourth Amendment rights was presented to the grand jury which returned the Indictment.  The grand jury was made aware of the July 28, 2009, search warrant, the statement made by Carey Bergin at the time of the search warrant, the contents of the safe, and ledgers relating to the drug organization and the individuals involved (Doc. #188, pp. 440-53).  Federal arrest warrants were issued based upon the Indictment (Docs. #4-12).  Pursuant to these arrest warrants, Defendant Carey Bergin was arrested on September 22, 2009, and defendant Powner was arrested on September 23, 2009.  Each separately made post-arrest statements to the federal investigators.  (Doc. #188, pp. 376-81, 382-84).  Defendants argue

that the Indictment, arrest warrants, and evidence seized in connection with the arrest warrants were tainted because the grand jury considered information obtained in violation of the Fourth Amendment.

The Court disagrees. It is clear that the exclusionary rule for Fourth Amendment violations does not apply to grand jury proceedings, and that "no new Fourth Amendment wrong" is committed by the use of such evidence before the grand jury. <u>United States v. Calandra</u>, 414 U.S. 338, 354 (1974). <u>See also</u> <u>United States v. Leon</u>, 468 U.S. 897, 906 (1984). Since the evidence, even though unlawfully obtained, was lawfully presented to the grand jury, neither the Indictment nor the federal arrest warrants were tainted by unlawful conduct. Therefore, the post-arrest statements and evidence seized in connection with those arrests (including Carey Bergin's ledgers) will not be suppressed.

## C.  Testimony of Co-Defendants

Defendants also seek to bar the testimony of co-defendants based upon the assertion that their identities were discovered as the result of the Fourth Amendment violations. The court file reflects that co-defendants Jarett Sprafka, Shandy Albert, Julie Becker, Theresa Martinez, and Susan Hamilton have entered into Plea Agreements (Docs. #95, 100, 105, 108, 181) with the United States which contain a provision requiring their cooperation and

testimony.  One defendant, Matthew Gross, plead guilty without a plea agreement (Docs. #234, 235, 237).

It is clear that the testimony of a live witness can be the subject of the exclusionary rule.  The Supreme Court has rejected "a per se rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." United States v. Ceccolini, 435 U.S. 268, 274-75 (1978).  The Supreme Court also rejected the view that if the road from the unlawful conduct to the live witness was uninterrupted, its length was immaterial. Ceccolini, 435 U.S. at 275.  Instead, the Supreme Court held that the length of the road is material, as is the degree of free will exercised by the witness and the fact that "such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby." Ceccolini, 435 U.S. at 277.  "In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." Ceccolini, 435 U.S. at 278.

The Court finds that the testimony of none of these persons should be barred by the exclusionary rule.  The Fourth Amendment issues raised by the Bergins and Powner were not applicable to any of these witnesses, and none of the witnesses had their

constitutional rights violated in any way by the police conduct. The Indictment as to each of them suffers from no possible taint. Each witness was represented by counsel, decided to plead guilty and cooperate with the United States, and participated in the normal guilty plea colloquy to ensure the knowing and voluntary nature of the guilty plea. Regardless of how their identities were discovered, the Indictment and subsequent guilty pleas are intervening events which attenuate any taint from the Fourth Amendment violations as to the Bergins and Powner.

Additionally, Susan Hamilton was arrested based upon probable cause unrelated to the events of July 28, 2009; she was arrested based upon her conduct in June 2009 (Doc. #186, pp. 234-36, 262-63; Doc. #188, pp. 339-47). Similarly, Julie Becker was arrested on August 4, 2009, in a different county when she passed a fraudulent prescription, and a color-coded day planer was seized. Becker gave a post-arrest statement, and then was interviewed in jail on August 11 and 18, 2009, after being advised of her <u>Miranda</u> rights, providing a detailed statement identifying co-conspirators (Doc. #186, pp. 251-53; Doc. #188, pp. 347-53). Jarett Sprafka voluntarily contacted law enforcement on August 26, 2009, as the result of a pharmacy alert, and gave a pre-arrest <u>Mirandized</u> statement (Doc. #188, p. 355).

**D.   Prescriptions, Day Planner, Pharmacy and Physician Alerts**

The Court finds that the prescriptions, day planner, pharmacy and physician alerts would have been discovered despite the events of July 28, 2009, given the pre-existing investigation by Task Force Agent Baginski, and the information from Hamilton and Becker. The Court agrees with the government as to these items (Doc. #192) and, accordingly, they will not be suppressed.

Accordingly, it is now

**ORDERED:**

1.   The Magistrate Judge's Report and Recommendation (Doc. #205) is **ACCEPTED AND ADOPTED** in part, **REJECTED** in part, and supplemented as set forth above.

2.   Defendant Jason Bergin's Motion to Suppress Evidence (Doc. #92) is **GRANTED IN PART AND DENIED IN PART** as set forth below.

3.   Defendant Robert Powner's Motion to Suppress Evidence as Adopted (Doc. #110) is **GRANTED IN PART AND DENIED IN PART** as set forth below.

4.   Defendant Carey Bergin's Motion to Suppress Evidence as Adopted (Doc. #151) is **GRANTED IN PART AND DENIED IN PART** as set forth below.

5.   The following items, or testimony about them, may not be introduced by the United States in its case in chief:

(A) Testimony about the observations by Deputy Canfield during the Second Entry is suppressed.

-53-

(B) Testimony about the observations by any officer during the Third Entry.

(C) Testimony about the statements by Carey Bergin to Detective Rodrigo, her consent to enter the residence, and any observations made by officers inside the residence during the Fourth Entry.

(D) Testimony about the statements by Carey Bergin to Detective Nolen at approximately 6 a.m. and Detective Nolen's observations inside the residence during the Fifth Entry.

(E) Testimony about observations by any officer during the Sixth Entry, and all tangible items seized by any officer in connection with that entry.

(F) Testimony about the recorded statement of Carey Bergin on July 28, 2009.

**DONE AND ORDERED** at Fort Myers, Florida, this ___6th___ day of August, 2010.


JOHN E. STEELE
United States District Judge


Copies:
Counsel of Record